UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| CLAIRMONT PLACE CONDOMINIUM | ) | |
| ASSOCIATION, INC., | ) | CASE NO. 21-58123-lrc |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| PAUL M. MCGOUGH, | ) | |
| | ) | CONTESTED MATTER |
| Movant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CLAIRMONT PLACE CONDOMINIUM | ) | |
| ASSOCIATION, INC. | ) | |
| | ) | |
| Respondent | ) | |
| _____ | ) | |

**MOTION TO (1) DISMISS CASE AS BEING FILED IN BAD FAITH FILING OR,
ALTERNATIVELY, (2) REMOVE DEBTOR AS DEBTOR IN POSSESSION**

COMES NOW Paul M. McGough ("McGough") and hereby files this *Motion to (1)
Dismiss Case as Being Filed in Bad Faith, or, Alternatively, (2) Remove Debtor as Debtor in
Possession* (the "Motion"), showing as follows:

**Background**

1.      Clairmont Place Condominium Association, Inc. ("Debtor") filed its voluntary

Chapter 11 petition on October 29, 2021 (the "Petition Date").

2.      Debtor is a homeowner association whose members are the owners (the

"Owners") of 209 condominium units located at 1800 Clairmont Lake, Decatur, Georgia (the

"1800 Building"). The Owners have an undivided interest, equivalent to his or her fraction of

ownership, in a 63,000 square foot building located at 2100 Clairmont Lake, Decatur, GA 30033 (the "2100 Building").

3.      Debtor has represented itself as the owner of the Montclair in public records, private agreements, and its own website at https://montclairpersonalcare.org/.

4.      The first floor of the 2100 Building provides communal space and services to the Owners (the "Service Center"). The second floor houses the Montclair at Clairmont Place Personal Care Home ("Montclair"), a personal care home with 58 rooms whose residents pay rent for housing and services. The tenants of the Montclair have their own common areas and do not use the Service Center's first floor amenities.

5.      Article 7.2 of the *Amended and Restated Declaration of Condominium for Clairmont Place, a Condominium* recorded at Book 08811, Page 0024, DeKalb County Records (the "Declaration") provides that Debtor, through its Board of Directors (the "Board"), may enter an agreement with parties to operate the Service Center. Article 7.3 of the Declaration authorizes the Board to lease all or a portion of the Service Center. The value of the right to lease 58 rooms in the Service Center alone exceeds the amount of Debtor's obligations to creditors.

6.      Article 13 of the Declaration provides that Owners are liable for assessments for, among other things, expenses of administration, common utility charges, maintenance, and other amounts determined by the Board. The Board provides a budget of expenses and assessments to the Owners, who retain the right to disapprove of the budget and any assessments at a duly called meeting.

**Management by McGough and Collateral Assignment of Leases**

7.      In 2009, Debtor and Senior Association Management, LLC ("SAM") entered into a Management Agreement dated July 17, 2009 (as amended from time to time, the "Management Agreement"), pursuant to which SAM provided, among other things, management services to Debtor. McGough, who had been acting as managing director of Debtor since 2000 under a different management company, became the Managing Director of Debtor. Under McGough's management, Debtor consistently exceeded its budgeted net income goals.

8.      In 2010, Debtor, McGough and SAM also entered into an agreement (as amended from time to time, the "Construction Agreement"), pursuant to which McGough and SAM agreed to construct certain additions to Montclair. These construction services ultimately increased the revenue of the Montclair by 180%.

9.      Debtor and McGough also entered into a *Collateral Assignment of Lease or Leases and Rents* dated June 16, 2011 (as amended from time to time, the "Collateral Assignment"), pursuant to which Debtor assigned to McGough leases and rents from the Montclair. Notice of the Collateral Assignment was recorded at Book 22525, Page 139, DeKalb County Records. The term of the original Collateral Assignment has been extended through various amendments.

10.      Disputes arose between Debtor and McGough, among others, relating to the Management Agreement, the Construction Agreement, the Collateral Assignment, and the relative obligations and duties owed. In July of 2018, Debtor, McGough, SAM and another party entered into a *Settlement Agreement and Mutual Release* (the "Settlement Agreement"), , a copy of which is attached hereto as Exhibit "A, pursuant to which Debtor obligated itself to pay $7,200,000 in two hundred forty (240) monthly installments of $30,000 each (the "Installments"). In the event

of default, McGough could exercise his rights in and to the rents of the Montclair. The Collateral

Assignment was extended through July 11, 2038.

11.    Under the Settlement Agreement, McGough was to receive every six months a

Montclair Tenant Report which would include "the name and address of responsible payor

(including those responsible for payments as well as those voluntarily paying for others, to the

extent known by [Debtor], as well as the *rental* rate, for each *tenant* current as of the end of the

month immediately preceding the due date of the report…" (emphasis added)  At the time of the

Settlement, the occupancy of the Montclair was approximately 92%.

12.    The Settlement Agreement further included complete releases of McGough, SAM,

and other related to and affiliated with McGough, and, among others, all their agents,

representative, and successors, and assigns.

13.    Debtor timely made all Installments as they came due until the Petition Date.

14.    After the Board took over management and operations of the Montclair and Service

Center, the person responsible for marketing for the Montclair was terminated without

replacement.

15.    Management of the Montclair and the Service Center were turned over to persons

that lacked experience in management of a personal care home. By the end of 2019, occupancy of

the Montclair had dropped to approximately 70%. On information and belief, the occupancy of the

Montclair is currently at approximately 55%.

**Indicia of Bad Faith**

16.    The Board has grossly mismanaged Debtor.

17.    On information and belief, the Board has not increased assessments to Owners in

the last three (3) years. If the Board exercised its duties and made reasonable increases to

assessments, there would be ample income to operate the 1800 Building, the Montclair, and the Service Center, as well as pay debt servicing to McGough. Nevertheless, the Owners receive the benefits of the Service Center.

18.     On information and belief, the Board has not employed a professional manager or operator for the Montclair, has not employed a Service Center Operator, and has not sought to lease the Service Center. If any of these actions were taken there would be ample income to operate the 1800 Building, the Montclair, and the Service Center, as well as pay debt servicing to McGough.

19.     Debtor never contacted McGough prior to filing this case, despite McGough being the overwhelmingly largest creditor in the case. Debtor never apprised McGough of its financial issues in an effort to address debt relief options.

20.     Debtor was not facing financial difficulty and was not in financial distress on the Petition Date. On information and belief, Debtor was current on its vendor payments on the Petition Date.

21.     Debtor has initiated an adversary proceeding seeking, among other things, a determination that (i) McGough does not have an allowed secured claim in the rents generated by the Montclair because the "revenue stream" is personalty subject to perfection by a UCC-1 financing statement, a position that is utterly without merit, (ii) the value of the rents and future rents is zero such that there is no value to which McGough's Collateral Assignment attaches, and (iii) McGough's Collateral Assignment does not attach to rents paid after the Petition Date.

22.     Debtor's representation to this Court that perfection is the key issue in this case is completely misleading and ignores the fact that McGough has an enforceable contractual claim against Debtor irrespective of any issue of perfection.  Even if Debtor's perfection position had

merit, a determination regarding perfection has absolutely no effect on the contractual liability of

Debtor to McGough.  The only difference is that McGough would have to reduce his claim to

judgment. Given the value of Debtor's assets, which consist of a rights and to a 63,000 square foot

buildings worth millions of dollars and the unfettered right to lease the building, and the Settlement

Agreement, which fixed the amount of McGough's claim, there is no legal or factual basis to

support any position that results in anything less than full payment of Debtor's contractual

obligations to McGough.

23.     Debtor is using this case not to restructure but in a bad faith effort targeted

specifically to strip McGough of his (i) rights in and to the rents under the Collateral Assignment,

and (ii) right to be paid as a creditor, all while failing to take any action whatsoever to realize value

from Debtor's rights in and to the Service Center or to impose a fair and appropriate assessment

on the Owners.

24.     Debtor is further taking positions before this Court that lack any justifiable legal or

factual basis. Debtor has willfully misrepresented the costs of operation of the Service Center by

overly inflating allocations attributable to the Montclair and thereby concealing the benefits to the

Owners. All of this is designed in bad faith to eliminate the debt owed to McGough for a pittance,

while Debtor retains millions of dollars in economic value. This bankruptcy was filed to permit

the Owners and the Board to retain all the benefits of the Service Center and the rents without

having to pay the legal obligations owed McGough, all of which could be readily satisfied.

25.     The Board has a clear conflict. It could fulfill its fiduciary duty by making

appropriate assessments to cover the operational costs of the Service Center or to take action to

lease the Service Center to a competent operator or employ competent management. Instead, the

Board filed this bankruptcy in bad faith so that the Owners and the Board can benefit from the use

of the Service Center and its improvements It is the Owners and the Board that reap the benefits from the daily use of the Service Center, and they are trying to continue to do so without having to pay for them.

26.     This bankruptcy is not a good faith effort to reorganize. It is an abuse of the Subchapter V process and a blatant misuse of the provisions of the Bankruptcy Code.

## Motion to Dismiss

27.     "The bankruptcy laws are intended as a shield, not as a sword." *In re Penn Central Transportation Co.*, 458 F. Supp. 1346, 1356 (E.D.Pa.1978). "Congress could not have intended that the debt-free, financially secure [debtor] be permitted to engage the bankruptcy machinery solely to avoid an enforceable … contract. From all that appears, the contract was negotiated at arms length; if the [debtor] now feel that it is less attractive than it should be, the difference is attributable to changes in the economic climate not to the [debtor's] financial situation. The bankruptcy laws were simply not intended to be used as a sword by the rapacious." *In re Waldron*, 785 F.2d 936, 940 (11th Cir. 1986)(finding that a petition filed by parties with no real financial pressure but solely to reject an option agreement is a bad faith abuse of the system).

28.     Although there is no precise test for determining bad faith, courts have recognized factors which show an "intent to abuse the judicial process and the purposes of the reorganization provisions." *In re Dixie Broadcasting, Inc.*, 871 F.2d 1023 (11th Cir. 1989) (quoting *In re Natural Land Corp.*,  825 F.2d 296, 298 (11th Cir. 1987)). Factors include the timing of the petition, whether the debtor faced financial distress, whether the petition was an effort to avoid an unprofitable contract, and whether the debtor attempts to disguise its financial wellbeing. See, e.g. *In re Watkins*, 201 B.R. 394 (Bankr. N. D. Ga. 1987).

29.     Debtor was not facing financial distress on the Petition Date, and in fact was current

on its obligations. The unsecured creditor body appears to be vendors with debts that were incurred

and paid in the ordinary course, and which were within terms. Further, some of vendors represent

insurance companies with premium payments due in the ordinary course and for which the Court

approved payment.

30.     This bankruptcy represents a scheme to abuse the system and strip McGough of his

contractual rights in and to the Montclair rents. The Collateral Assignment identifies the Montclair

units as rental units. The Settlement Agreement provides that the residential units in the Montclair

are leased and that its residents are tenants. The Montclair Tenant Reports identify the units, the

tenants, and the rent each tenant pays for a unit. On information and belief, Debtor has always

reported the amounts paid by tenants of Montclair as rents. While there are services rendered to

the tenants of the Montclair as a personal care home, those services are not separately charged.

Instead, they represent part of the benefits received by the tenants in exchange for the payment of

rent.

31.     Debtor is now contradicting all prior representations as to the nature of the amounts

paid by tenants of the Montclair (whether in the Collateral Assignment, the Settlement Agreement,

and previous financial statements) for the sole purpose of avoiding McGough's Collateral

Assignment and depriving him of his rights. The bankruptcy was filed for no other purpose. This

is evidence of bad faith. *In re Northwest Place, Ltd*., 73 B.R. 978, 982 (Bankr. N. D. Ga.

1987)("The sole purpose of this case is not to reorganize within the historical meaning of that word

in the context of the Bankruptcy Code. Rather, the Debtor is using the provisions of Chapter 11 to

assert the powers of the trustee as a debtor-in-possession in order to set aside the security interest

of the [creditor].")

32.     This is a bad faith abuse of the bankruptcy system as a sword and not a shield, made worse by the blatant disregard by Debtor of all its prior representations as to the rents collected from tenants of the Montclair. It was filed for the sole purpose of harming one creditor. It is egregious abuse of the system and cannot be allowed.

33.     Further, Debtor has disguised its financial wellbeing. Debtor is attempting to improperly allocate overhead to the Montclair in an effort to disguise its positive cash flow. The first floor of the Service Center is for the use of the Owners and houses a dining room approximately 5,000 square feet), condo administrative offices, living room and reception area, library, fitness and weight room, arts and crafts room, movie theatre room, condo association community meeting room, large kitchen for community meal preparation, and an indoor swimming pool. The Montclair avails itself of none of those amenities.

34.     Debtor has deceptively and disingenuously allocated dining room and food service costs to the Montclair. Clairmont Place has a food service operation primarily to serve the Owners. Lunch and evening supper meals are prepared for the Owners who come to the large dining room located on the first floor of the 2100 Building.  The dining room is staffed with wait staff and kitchen staff for both of the Owners' meals. The wait staff,  who comprise more than 50% of the food service department staff, do not serve the Montclair, whose tenants eat their meals in their own second floor dining room.

35.     Montclair tenants also receive breakfast in addition to lunch and supper. Debtor's food service department has a cook and a kitchen assistant report to work approximately 4 hours earlier each day to prepare breakfast for the Montclair tenants, consisting mainly of eggs, toast, grits, oatmeal, coffee, juice and milk.  This results in a very modest increase in total food cost. However, Debtor's budget for Montclair 30% of Debtor's total food service costs, despite the fact

that Montclair's tenants comprise only 12.5% of the total Debtor population and use none of the

wait staff.  A more realistic food service allocation to Montclair would be approximately $34,830

per month (approximately $36 per person per day), which reduces Montclair's monthly expenses

by $17,352. This eliminates Montclair's projected budgeted loss.

36.      There are other budgeted items that are improperly allocated to the Montclair solely

for the purpose of disguising its actual cash flow, which is part and parcel of Debtor's bad faith in

this case.

37.      Additionally, this bankruptcy is motivated not by a legitimate reason to restructure

but as a result of personal animosity between members of the Board and McGough initiated with

specific intent to harm McGough.

38.      Accordingly, this case must be dismissed as filed in bad faith.

**Alternatively, Motion to Remove Debtor as Debtor in Possession**

39.      11 U.S.C. § 1185 provides that the Court shall order that a debtor not be debtor in

possession for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the

affairs of the debtor, ither before or after the commencement of the case. Upon removal as debtor

in possession, the SubChapter V Trustee shall have all the duties of a trustee under 11 U.S.C. §

1106(a)(1).

40.      If the Court does not dismiss this case as filed in bad faith, the Court should remove

Debtor as debtor in possession.

41.      The attempted recharacterization of the Montclair rents in contradiction of all prior

representations and characterizations by Debtor and the improper and misleading allocations of

budgeted items reflect fundamental dishonesty by the members of the Board.

42.    The complete lack of experience by management of the Montclair and the lack of any adequate marketing necessary to maximize rent collection is evidence of gross mismanagement.

43.    The refusal of the Board, which is comprised of Owners, to charge appropriate assessments to the Owners represents a clear conflict of interest.

44.    Accordingly, if the case is not dismissed, cause exists for Debtor to be removed as debtor in possession.

WHEREFORE, McGough prays that the Court (i) dismissed this case as having been filed in bad faith, (ii) alternatively, Debtor be removed as debtor in possession, and (iii) grant such other relief as is just and proper.

Dated: November 23, 2021

LAMBERTH, CIFELLI,
ELLIS & NASON, P.A.
Counsel for Paul M. McGough


By: */s/ G. Frank Nason, IV*
G. Frank Nason, IV
Georgia Bar No. 535160
fnason@lcenlaw.com


6000 Lake Forrest Drive, NW
Suite 435
Atlanta, Georgia 30328
(404) 262-7373

**Certificate of Service**

This is to certify that I have on this day electronically filed the foregoing *Motion to (1)*
*Dismiss Case as Being Filed in Bad Faith, or, Alternatively, (2) Remove Debtor as Debtor in*
*Possession* using the Bankruptcy Court's Electronic Case Filing program, which sends a notice of
this document and an accompanying link to this document to the following parties who have
appeared in this case under the Bankruptcy Court's Electronic Case Filing program:

    Jonathan S. Adams
    jonathan.s.adams@usdoj.gov

    Leon S. Jones (Sub V Trustee)
    ljones@joneswalden.com
    jwdistribution@joneswalden.com

    Shayna M. Steinfeld
    shayna@steinfeldlaw.com
    paralegalnotices@gmail.com

Dated: November 23, 2021

                                  */s/ G. Frank Nason, IV*
                                    G. Frank Nason, IV
                                    Georgia Bar No. 535160

6000 Lake Forrest Drive
Suite 435
Atlanta, Georgia 30328
(404) 262-7373